**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **Phil's BBQ, Inc., individually and on behalf of all others similarly situated,** | **Case No.** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **vs.** | **JURY TRIAL DEMANDED** |
| **Agri Stats, Inc., Clemens Food Group, LLC, Hormel Foods Corporation, Indiana Packers Corporation, JBS USA, Seaboard Foods, LLC, Smithfield Foods, Inc., Triumph Foods, LLC, Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc.** | |
| **Defendants.** | |

Plaintiff Phil's BBQ, Inc. brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") consisting of all persons who purchased pork[1] directly from any of the Defendants or their subsidiaries or affiliates and their co-conspirators for use or delivery in the United States from at least as early as January 1, 2009 until the Present (the "Class Period"). Plaintiff brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a trial by jury.

## I.    NATURE OF THE ACTION

1.    The United States pork industry, which averages approximately $20 billion in annual commerce, is dominated by a small number of large pork producers. In this highly concentrated industry, pork integrator-Defendants and their co-conspirators controlled, at all times relevant, over 80% of the U.S. wholesale pork market.

2.    Plaintiff is informed and believes, and thereon alleges, that in order to maintain price stability and increase profitability, beginning at least as early as January 1, 2009, Defendants and their co-conspirators conspired and combined to fix, raise, maintain, and stabilize the price of pork. The principal, but not exclusive, method by which Defendants and their co-conspirators implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing pork prices in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about pork prices, capacity, sales volume, and demand, through third-party co-conspirator, Agri Stats, Inc. Plaintiff is further informed and believes that Defendants fraudulently concealed their anticompetitive conduct from Plaintiff and the Class in furtherance of the conspiracy, and as a result there may be other methods by which Defendants

---

[1] Pork includes fresh or frozen pig meat, smoked ham, sausage, and bacon.

carried out their conspiracy which presently are not known to Plaintiff and the Class.

3.      Agri Stats is a private information-sharing subscription service that collects, analyzes, and then publishes data from agricultural producers, such as pork and poultry producers, in the form of confidential weekly reports to their paying subscribers. Weekly industry reports contain exhaustive data about the internal operations of industry producers, such as product prices, capacity, and financial returns at different producer plants or farms. Agri Stats' subscribers consist mostly of the producers themselves, including Defendants and their co-conspirators. None of the data or information contained in Agri Stats reports are available to the public. While producers are not referred to by name in the weekly reports, due to the small number of pork producers in the U.S. pork market, the identities of the listed producers are easily identifiable, and producers are quickly able to match the published data with their competitors. Agri Stats reports effectively allowed Defendants and their co-conspirators to exchange competitively sensitive data and information.

4.      The data exchanges through Agri Stats bear all the hallmarks of the enforcement mechanism of a price-fixing conspiracy. First, the data is current and forward-looking, which courts have consistently held has "the greatest potential for generating anticompetitive effects." *See Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *U.S. v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). Second, information contained in Agri Stats reports is specific to the pork producers, including information on profits, prices, costs and production levels. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity." *Id.* at 212. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the co-conspirators to pay millions of dollars over the class period – far in excess of any other pricing and production indices.

"Public dissemination is a primary way for data exchange to realize its pro-competitive potential." *Id.* at 213.

5. Defendants and their co-conspirators further admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other to restrain and limit supply.

6. In addition, there are numerous "plus factors" in the pork industry during the Class Period, including but not limited to multiple characteristics which facilitated collusion, such as a highly concentrated market with a high degree of vertical integration and high barriers to entry, a lack of significant substitutes, and inelastic supply and demand.

7. Defendants' cooperative restriction on and restraint of pork supply had the intended purpose and effect of increasing pork prices to Plaintiff and the Class. Beginning in 2009, Defendants' earnings began to increase as they took an increasing amount of the profits available in the pork industry. As a result of Defendants' unlawful conduct, Plaintiff and the Class paid artificially inflated prices for pork during the Class Period. Thus, Plaintiff and the Class were injured by Defendants' illegal, anticompetitive conduct.

## II.   JURISDICTION AND VENUE

8. Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act § 1.

9. The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this

District, and one or more Defendants reside in this district.

10.     This Court has personal jurisdiction over each Defendant because each Defendant, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of pork products throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

11.     By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court. Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

12.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.    INTERSTATE TRADE AND COMMERCE

13.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including this District.

14.     During the Class Period, Defendants produced, sold, and shipped pork in a continuous and uninterrupted flow of interstate commerce. Defendants' price-fixing conspiracy

4

had a direct, substantial and reasonably foreseeable effect on interstate commerce in the United States.

## IV.   PARTIES

### A.   Plaintiff

15.   Plaintiff Phil's BBQ, Inc. is a California corporation with its principal place of business in San Diego, CA. Phil's BBQ, Inc. purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

### B.   Defendants

16.   Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, PA. During the Class Period, Clemens and/or its predecessors, wholly owned or controlled subsidiaries or affiliates, sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

17.   Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. Hormel Foods is headquartered in Austin, MN. During the Class Period, Hormel Foods and/or its predecessors, wholly owned or controlled subsidiaries or affiliates, sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

18.   Indiana Packers Corporation is an Indiana corporation engaged in the production of meat and food products, and the marketing of these products. Indiana Packers is headquartered in Delphi, IN. During the Class Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries or affiliates, sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19.     JBS USA is one of the world's largest beef and pork processing companies and an indirect wholly owned subsidiary of Brazilian-based JBS SA. JBS USA is a wholly owned subsidiary of JBS USA Holdings, Inc., which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken producing companies in the world. JBS USA is a Delaware corporation, headquartered in Greeley, CO. During the Class Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries or affiliates, sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20.     Seaboard Foods LLC is a limited liability company headquartered in Shawnee Mission, KS. During the Class Period, Seaboard Foods and/or its predecessors wholly owned or controlled subsidiaries or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirectly wholly owned subsidiary of WH Group Limited, the largest pork company in the world. Smithfield Foods is headquartered in Smithfield, VA. During the Class Period, Smithfield Foods and/or its predecessors wholly owned or controlled subsidiaries or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22.     Triumph Foods, LLC is a limited liability company headquartered in St. Joseph, MO. During the Class Period, Triumph Foods and/or its predecessors wholly owned or controlled subsidiaries or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

23.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in

Springdale, AR. During the Class Period, Tyson Foods and/or its predecessors, wholly owned or controlled subsidiaries or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

24.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, AR, and is a wholly owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly owned or controlled affiliated, to purchasers in the United States.

25.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, AR, and is wholly owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

26.     Defendants Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc., are collectively referred to herein as "Tyson."

27.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, IN, and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-conspirator of Defendant Producers by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

## V.     FACTUAL ALLEGATIONS

28.     Starting in at least 2009 and continuing to the present, Defendants coordinated to fix, raise, maintain, and stabilize pork prices. To effectuate and ensure the stability of their price-fixing agreement, Defendants relied on a unique industry data sharing service known as Agri Stats. Agri Stats provided a means for Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a

central and critical part of Defendants' price-fixing scheme, resulting in a remarkably stable and successful anticompetitive cartel.

A.    **Agri Stats Marketed Its Collusive Scheme to the Pork Integrators.**

29.    Agri Stats has played a central role in other industries, including collusion in the broiler industry.[2] As alleged in the *In re Broiler Chicken Antitrust Litig.,* No. 16-cv-08637 (N.D. Ill.), the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices. In denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litig.*, the district court noted that given the nature of the Agri Stats reports, the defendants were in fact sharing future anticipated production information with one another, which suggested significant antitrust concerns.[3]

30.    Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the pork industry along the lines of the benchmarks used to restrict competition in the broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies, including competitors. Benchmarking of the type undertaken by Agri Stats and its co-conspirators here reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive information among competitors.

31.    In 2008, Greg Bilbrey of Agri Stats told pork industry producers that "[b]enchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. Each and every

---

[2] Broilers are chickens raised to be slaughtered before the age of 13 weeks.
[3] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

commercial swine operation is encouraged to participate in some benchmarking effort."

32.     Agri Stats emphasized to pork producers that the goal of the conspiracy, and the agreement to share information, was profitability, not production, and invited pork producers to participate in the benchmarking. Agri Stats emphasized that "[w]e must remember that the ultimate goal is increasing profitability – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program."

33.     In April 2009, Agri Stats' Bilbrey again invited pork producers to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. Producer groups could design and operate their own benchmarking effort."

34.     The pork producers did accept this offer, and beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports. The agreement between Defendants was to use the exchanged benchmarking information to reduce the supply and stabilize the prices of pork sold in the United States, to provide and receive information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing. As set forth below, so as to maintain a reduction of production and an increase in prices. The agreement was successful as prices increased significantly after the agreement was reached.

35.     The scope of commerce in the pork industry during the Class Period was enormous. For example, total pork sales in the United States were $23.4 billion in 2013, $26.4 billion in 2014,

$21 billion in 2015, and $18.9 billion in 2016.

36.    Relatedly, each Defendant's annual sales of pork products were also immense during the Class Period. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase margins even slightly has a significant effect on profits.

**B.    Agri Stats Provided Pork Integrators the Unparalleled Ability to Monitor, or Discipline Co-Conspirators For Not Complying with the Collusive Agreement.**

37.    Agri Stats provided pork integrators with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as production levels and short and long-term production capacity. Agri Stats was key to the formation, operation and continuing stability of Defendants' price-fixing scheme. In order to organize an effective price-fixing agreement, the participants had to have confidence that each member was following through with the agreement by limiting their production and stabilizing prices. Agri Stats served that function here.

38.    Each member of the conspiracy, including swine integrators and Defendants Clemens, Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson were all Agri Stats subscribers. Agri Stats' parent company, Eli Lilly, stated that "over 90% of the poultry and pig market" uses Agri Stats in the United States.

39.    Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way.

10

40.     Participants in the scheme received detailed monthly reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales. Participants may also receive an abbreviated Key Performance Indicator report, as well as historical graphs.

41.     Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years, which is a function of biology. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly 2 years to substantially increase production.

42.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the pork market:

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

43.    The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same presentation informed pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg."[4] This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production – in fact, the opposite was true. The purpose was the profitability of the Defendant companies and the impact was higher sales prices for purchasers.

---

[4] CKG refers to 100 kilograms.

44.    Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.

45.    Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis between competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



46.    Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine

13

tolerance and outlier status and enforce," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "[e]ach participant has to commit."

47.     In addition to these reports, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis. The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the books. The fee for the visits fluctuated based on size and other factors.

48.     A common saying in the Agri Stats circle is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "the ultimate goal is increasing profitability – not simply increasing level of production."

49.     By providing detailed production statistics by producer, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the co-conspirators to determine each other's future production in addition to their current production.

50.     Agri Stats reports are organized by company and facility, but the producers' names are not listed in the reports. Nevertheless, while nominally anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that producers can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

51.     Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an arduous undertaking the company was not eager to embark on.

52.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. The front of the book included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

53.     Agri Stats mailed the reports to its pork supplier customers. On occasion, Agri Stats shipped a producer's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that producer, given that their numbers were highlighted by Agri Stats in their books.

54.     Mobility within the meat production industries led to a situation where many workers at most pork production operations knew the numbers of other regional facilities, removing any anonymization of the data which did exist. Agri Stats would hire industry participants to work in their offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats noticed this problem almost immediately, but did nothing to fix the problem.

55.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price-fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production

to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

56.    In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler chicken industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

## C.    The Level of Concentration in the Pork Industry Was Optimal For the Collusive Scheme.

57.    Prior to and in the beginning of the Class Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share. Between 1988 to 2015, the top four pork integrators (Smithfield, Tyson, JBS and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. The top eight integrators had market share of well over 80 percent for the entire class period. *See* Figure 1.

16

**Figure 1: Market Share of the Top 8 Pork Integrators (1991 – 2017)**



Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI.Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

58.     The hog production sector is horizontally concentrated (only a few companies buy,
slaughter and process the majority of hogs) and vertically integrated (pork packers have tight
contractual relationships with hog producers throughout all stages of production). Meatpacking
concentration levels are among the highest of any industry in the United States, and well above

17

levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

59.     In July 2015, JBS USA announced it would be acquiring Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.

60.     The acquisition completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

61.     The concentration level in the pork industry was optimal for collusion. Defendants and co-conspirators accounted for over 80% of the U.S. pork market. WH Group Limited, the parent company of Smithfield, characterized the U.S. market pork industry as "relatively mature and concentrated." Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

62.     The level of concentration in the pork industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because none of the largest producers were capable of independently controlling price through their own production, such an agreement was necessary to inflate price.

63.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants to the market. Where there are significant barriers to entry, however, new entrants are less likely. High barriers to entry have protected the pork cartel by keeping competitors out of the pork packing industry. Entry into pork processing is costly and time consuming. Construction of large-scale slaughter facilities costs hundreds of millions of dollars and the additional planning, design and permitting costs are also substantial. For instance, in 2012, it cost Cargill $25 million just to expand an existing facility. Building a facility from scratch would be expensive and time consuming.

### D.     The Pork Industry is Nearly Fully Vertically Integrated, Which Allowed the Collusive Scheme to Succeed.

64.     The pork production industry is almost completely vertically integrated, with four major producers controlling 75 percent of pork integration. Very large pork producers are commonly characterized as "contractors" or "integrators" who contract production of their hogs out to independent growers. Integration is so pervasive that major producers are commonly called pork or swine integrators by the industry, government, analysts and academics.

65.     In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

66.     Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when. As is clear from

19

Smithfield's annual report, under these arrangements, the pork integrators pay only fixed service fees to the farmers, who bear all of the investment costs of the hog raising facilities. The pork integrator, here Smithfield, retains ownership of the hogs at all points in time. This arrangement essentially converts independent farmers that own their livestock into contract employees that perform services for the pork-packing industry.

      **E.**      **Abnormal Pricing During the Class Period Demonstrates the Success of the Collusive Scheme.**

      67.      Beginning in 2009, the pork industry showed abnormal price movements. According to aggregate prices published by the USDA, the hog market year average price was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in 2015. The following graph shows the unprecedented increase in swine prices beginning in 2009, and staying elevated through 2018. *See* Figure 2: Average Hog Wholesale Prices in Cents Per Pound (2000-2018).

**Figure 2: Average Hog Wholesale Prices in Cents Per Pound (2000-2018)**



As this figure demonstrates, pork wholesale prices increased in 2009 and 2014, and continuously remained at this higher level compared to the years prior to 2009.

68.    Publicly available (albeit aggregated data) also shows that during this period, whole price variation/risk was almost entirely shouldered by farmers, while the pork integrators' earnings increased steadily over the years 2009 to 2017, with a slight decline in 2017. *See* Figure 3: Integrators and Farmers (Growers) Earnings Per Retail Weight (2000-2017).

**Figure 3: Integrators and Farmers (Growers) Earnings Per Retail Weight (2000-2017)**



**F.      Capacity and Supply Restraints During the Class Period.**

69.      As demonstrated in the following chart, at several points during the Class Period,

the pork integrators acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013,

the pork industry cut production.[5] The decreases in production largely occurred after a decrease in

pork wholesale prices. *See* Figure 4: U.S. Annual Commercial Hog Production by Weight (2000-

2017).

**Figure 4: U.S. Annual Commercial Hog Production by Weight (2000-2017)**

---

[5] The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014.



70.     In public earnings calls, Defendants made statements regarding their intentions to either stabilize or decrease supply (although they gave false reasons for this stabilization). For example, in May 2009, Larry Pope, the CEO and President of Smithfield stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.

71.     In May 2009, Hormel confirmed that, "We see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."

72.    In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that, "Somebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to Seaboard. Seaboard knows that . . . *That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.* We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.

73.    In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem. But the answer to that is yes, *I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.* But again, I don't think they can solve it.
>
> *I think this industry has got to solve it <u>collectively</u>.* I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. *But the answer is, yes, there are others cutting back. We're not the only one.*

74.    In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.

75.    The pork producers acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield stated:

> We certainly compare ourselves to our competitors as best we can. Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have. And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.

Smithfield had access to competitively sensitive information from its competitors, through the Agri Stats reports, which allowed it to know its competitors' confidential supply information.

76.     Supply level information regarding competitors allowed them to know that supply would not increase in the future, given the lifecycles of the animals. In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information from Tyson's competitor(s).

77.     When asked, in the face of ever-increasing margins, whether the type of profits would continue, in March 2011, Smithfield publicly signaled to its competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. …

> HEATHER JONES: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?

> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have -- should have good margins, but

I can't believe –

LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay. Thank you.

LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. … And by the way, we are not going to build a new plant to expand capacity.

78.     In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.

**G.      Overcharges Due to the Cartel Were Reflected in Higher Pork Prices, and Incurred by Direct Purchasers.**

79.     The USDA has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."

80.     The Bureau of Labor Statistics tracks commonly purchased products in its

26

Consumer Price Index (CPI). Those prices show that the retail price of pork has increased substantially for consumers over the class period. For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017. *See* Figure 5: CPI-Average Price Data for Bacon, Sliced, Per Pound (1995-2017).

**Figure 5: CPI-Average Price Data for Bacon, Sliced, Per Pound (1995-2017)**



81.     Similarly, the CPI index for other pork products, excluding canned ham and luncheon slices, show a marked increase over the class period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017. *See* Figure 6: CPI-Average Price Data for Other Pork, Per Pound (1995-2017).

**Figure 6: CPI-Average Price Data for Other Pork, Per Pound (1995-2017)**

27



82.    And the CPI index for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017. *See* Figure 7: CPI-Average Price for Ham, Per Pound (1995-2017).

**Figure 7: CPI-Average Price for Ham, Per Pound (1995-2017)**

83.    Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to stabilize the price and supply of pork was borne in large part by Plaintiff and the Class.

**H.    Defendants Actively Concealed the Conspiracy.**

84.    Throughout   the   Class   Period,   Defendants   effectively,   affirmatively,   and

fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the Class.

85.     The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

86.     In 2009, the President of Agri Stats, Blair Snyder, commented on how secretive the true nature of Agri Stats was, when he stated:

> Agri Stats has always been kind of a quiet company. There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth.

87.     At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly stating, "I'm not going to display the actual bottom line to the group here just because of the confidentiality [sic] nature of the information." And yet, despite refusing to show this information publicly, competitors were provided with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff, the Class and the public in general.

88.     At other times, Defendants attributed the stability in the pork market to other

reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, the

CEO Of Smithfield stated in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.

89.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants

and all of their co-conspirators, the running of any statute of limitations has been tolled and

suspended with respect to any claims and rights of action that Plaintiff and the other Class members

have as a result of the unlawful combination and conspiracy alleged in this complaint.

## VI.    CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action on behalf of itself and as a class action under the

provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of

the members of the following Plaintiff Class:

> All persons who purchased pork directly from any of the Defendants or any co-conspirator identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2009 until the Present. Specifically excluded from this Class are Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

91.     Class Identity: The Plaintiff Class is readily identifiable and is one for which records should exist in the files of Defendants and their co-conspirators.

92.     Numerosity: Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

93.     Typicality: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased pork directly from one or more Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

94.     Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

    a.    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize price of pork sold in interstate commerce in the United States;

    b.    The identity of the participants of the alleged conspiracy;

    c.    The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    d.    Whether the alleged conspiracy violated the antitrust laws;

    e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the members of the Class;

     f.       The effect of Defendants' alleged conspiracy on the prices of pork sold in the United States during the Class Period;

     g.       Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

     h.       The appropriate class-wide measure of damages.

These and other questions of law and/or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

95.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased pork and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

96.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law alleged herein. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single

court.

97.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

98.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VII.    ANTITRUST INJURY

99.    Defendants' conspiracy caused injury to Plaintiff and members of the Class by restraining and eliminating price competition among pork producers, thereby depriving all direct purchasers of pork of the benefits of a competitive market, and resulting in the setting of pork prices at artificially high levels.

100.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, or maintain the price of pork and, as a direct result of the conspiracy, Plaintiff and the members of the Class have been injured in their business or property in that they paid more for pork than they would have paid in a competitive market.

101.    Defendants and their co-conspirators knew and intended that their pricing actions regarding their sale of pork would have a direct impact on prices for pork for all direct purchasers of pork throughout the United States.

## VIII.    CLAIM FOR RELIEF

### CAUSE OF ACTION—VIOLATIONS OF SHERMAN ACT § 1

102.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

103.    Defendants' acts in furtherance of their combination or conspiracy were authorized,

ordered, or performed by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

104.    Beginning at the latest January 1, 2009, and continuing through the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of pork sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

105.    Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize prices for pork in the United States.

106.    Plaintiff and the Class members have been injured in their business or property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and the Class members paid more for pork than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

107.    Accordingly, Plaintiff and the Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## IX.    DEMAND FOR JURY TRIAL

108.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## X.    PRAYER FOR RELIEF

109.    Wherefore, Plaintiff demands judgment against Defendants as follows:

    a.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as

defined herein;

b.    That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

d.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

e.    That judgment be entered for Plaintiff and the Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law;

35

f.    That Plaintiff and the Class recover pre-judgment and post-judgment

interest as permitted by law;

g.    That Plaintiff and the Class recover their costs of the suit, including

attorneys' fees, as provided by law; and

h.    For such other and further relief as is just and proper under the

circumstances.


Dated: August 15, 2018                    Respectfully submitted,

                                          By:    *s/Garrett D. Blanchfield*
                                          Garrett D. Blanchfield, #209855
                                          Roberta Yard, #322295
                                          **REINHARDT WENDORF & BLANCHFIELD**
                                          W-1050 First National Bank Building
                                          332 Minnesota Street
                                          St. Paul, MN 55101
                                          Tel:    (651) 287-2100
                                          g.blanchfield@rwblawfirm.com
                                          r.yard@rwblawfirm.com

                                          Eugene A. Spector
                                          Jeffrey J. Corrigan
                                          Jonathan M. Jagher
                                          Jeffrey L. Spector
                                          **SPECTOR ROSEMAN & KODROFF, P.C.**
                                          1818 Market Street, Suite 2500
                                          Philadelphia, PA 19103
                                          Tel:    (215) 496-0300
                                          ESpector@srkattorneys.com
                                          JCorrigan@srkattorneys.com
                                          JJagher@srkattorneys.com
                                          JSpector@srkattorneys.com

                                          Michael J. Boni
                                          Joshua D. Snyder
                                          **BONI ZACK & SNYDER LLC**
                                          15 St. Asaphs Road
                                          Bala Cynwyd, PA 19004
                                          Tel:    (610) 822-0200
                                          mboni@bonizack.com

jsnyder@bonizack.com

Lee Albert
Brian Murray
**GLANCY PRONGAY & MURRAY LLP**
New York Helmsley Building
230 Park Ave., Suite 530
New York, NY 10169
Tel:    (212) 682-5340
labert@glancylaw.com
bmurray@glancylaw.com

Jeffrey S. Goldenberg
Todd B. Naylor
**GOLDENBERG SCHNEIDER, LPA**
One West Fourth Street, 18th Floor
Cincinnati, Ohio 45202-3604
Tel:    (513) 345-8297
jgoldenberg@gs-legal.com
tnaylor@gs.legal.com

Richard R. Gordon
**GORDON LAW OFFICES, LTD.**
111 West Washington Street
Suite 1240
Chicago, Illinois 60602
Tel:    (312) 332-5200
rrg@gordonlawchicago.com

David P. McLafferty
**MCLAFFERTY LAW FIRM, P.C**.
923 Fayette Street
Conshohocken, PA 19428
Tel:    (610) 940-4000
dpmclafferty@mclaffertylaw.com

Arthur N. Bailey
**RUPP BAASE PFALZGRAF
CUNNINGHAM LLC**
111 West 2nd Street, Suite 1100
Jamestown, NY 14701
Tel:    (716) 664-2967
bailey@ruppbaase.com